# Exhibit 6

                    BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA


    UNITED STATES OF AMERICA,           .
                                        .  Case Number 25-cr-69
              Plaintiff,                .
                                        .
         vs.                            .
                                        .
    ERLEND OLSON, JOHN J. GALLAGHER,    .
    STEPHEN BUSCHER, JOSEPH             .  Washington, D.C.
    FARGNOLI, JAMIL SWATI,              .  January 8, 2026
                                        .  11:06 a.m.
              Defendants.               .
    - - - - - - - - - - - - - - - - - -


                    TRANSCRIPT OF STATUS CONFERENCE
                  BEFORE THE HONORABLE ROYCE C. LAMBERTH
                      UNITED STATES DISTRICT JUDGE

    APPEARANCES:

    For the United States:        REBECCA ROSS, AUSA
                                  United States Attorney's Office
                                  601 D Street Northwest
                                  Washington, D.C. 20579

    For Defendant Olson:          BARRY COBURN, ESQ.
                                  Coburn & Greenbaum, PLLC
                                  1710 Rhode Island Avenue Northwest
                                  Second Floor
                                  Washington, D.C. 20036

    For Defendant Gallagher:      MICHAEL DIAMONDSTEIN, ESQ.
                                  Michael J. Diamondstein, P.C.
                                  2 Penn Center
                                  Suite 900
                                  Philadelphia, PA 19102

    For Defendant Buscher:        WHITNEY ELLERMAN, ESQ.
                                  4419 33rd Street North
                                  Arlington, VA 22207


                        -- continued --

2

APPEARANCES (CONTINUED):

For Defendant Fargnoli:        WILLIAM LOVETT, ESQ.
                               Lovett O'Brian LLP
                               155 Federal Street
                               Suite 1300
                               Boston, MA 02110

For Defendant Swati:           MAX NICHOLAS, ESQ.
                               Max Nicholas LLC
                               40 Exchange Place
                               18th Floor
                               New York, NY 10005


Official Court Reporter:       SARA A. WICK, RPR, CRR
                               333 Constitution Avenue Northwest
                               Room 4704-B
                               Washington, D.C. 20001
                               202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

3

P R O C E E D I N G S

(Call to order of the court.)

COURTROOM DEPUTY:  We are on the record with Criminal Case 25-069, United States of America versus Erlend Olson, John Gallagher, Stephen Buscher, Joseph Fargnoli, Jamil Swati.

Could counsel please approach the podium and state your appearances for the record.

MS. ROSS:  Rebecca Ross on behalf of the United States.

MR. COBURN:  Good morning, Your Honor.  Berry Coburn for Mr. Olson, who is here in court.

THE COURT:  Okay.

MR. DIAMONDSTEIN:  Good morning, sir.  Michael Diamondstein on behalf of Mr. Gallagher, who is present.

THE COURT:  Okay.

MR. NICHOLAS:  Good morning, Your Honor.  Max Nicholas on behalf of Jamil Swati, who is present on the Zoom.

THE COURT:  Okay.

MR. ELLERMAN:  Good morning, Your Honor.  Whit Ellerman on behalf of Mr. Buscher, who is present by video.

THE COURT:  Okay.

MR. LOVETT:  Good morning, Your Honor.  William Lovett on behalf of Mr. Fargnoli, who is appearing by video.

THE COURT:  All right.  Does the government want to start with your explanation of the status of the case?

MS. ROSS:  Again, good morning, Your Honor.

We had an opportunity to confer with defense counsel prior to this hearing today, and it is the government's understanding that no parties are ready yet to set a motions calendar or a trial date.

Since we have last appeared before Your Honor, we have continued to work towards preparing the CIPA Section 4 motion, as well as making sure that all of the defendants' counsel are cleared.  It is my understanding that counsel for defendant Olson have all been cleared, that counsel for defendant Gallagher have all been cleared except for one who is currently working on the application, that counsel for defendant Buscher should be approved for final access shortly, that counsel for defendant Fargnoli have all received final clearance, and that counsel for defendant Swati is still pending approval.  So that process is still in the works, and we continue to work on our -- getting everything that we need done to prepare our motion.

Additionally, Your Honor, we have continued to make sure that we have produced all necessary discovery.  To date, we have made three discovery productions, the last one being on October 15, 2025.

We have also -- we do have another small discovery production that we intend on making in the next couple of weeks.  And there will also be a discovery production that will be made on the filter side of things, the folks handling our filter

discovery.  We expect that to be a somewhat large production, because it will include the images of approximately 16 devices that were imaged on-site during the execution of the search warrant on Theia's headquarters.

So that's where we are in terms of CIPA and the discovery, and I am happy to answer any additional questions that Your Honor may have.

THE COURT:  So the one clearance that's not yet finalized, what's the status of that?

MS. ROSS:  It is pending approval.  So it's sort of just in limbo.  It's my understanding that -- and perhaps defendant Fargnoli's counsel will have more information for you. But it's my understanding that he has gone through the application process, all of the sort of necessary interviews, and it's just waiting kind of that final approval.

MR. LOVETT:  Just for the record, Mr. Fargnoli's attorneys have been cleared.

MS. ROSS:  Well, they have more up-to-date information than I have, Your Honor.

Oh, I apologize.  That's my fault.  I said defendant Fargnoli.  I apologize, Your Honor.  I think it should have been defendant Swati who is still pending approval.  I apologize.  I mixed up the defendants.  So it's defendant Swati's attorney, who may have more information, but it's my understanding that is just pending final approval.  And as well as Stephen Buscher's

attorney, who is also just waiting for that final approval.  So I think we're almost there.

THE COURT:  All right.  Once all of them have their final approval, what remains to be done, then?

MS. ROSS:  Your Honor, then we would have to file our CIPA Section 4 motion, which we intend to do as quickly as possible.  We were delayed somewhat because of the government closure.  That did slow things down.  But we do hope to have that motion filed in March, is our goal, Your Honor.

THE COURT:  What is going to be entailed in that motion?

MS. ROSS:  Your Honor, there's only so much I can say in open court, but it will contain sort of our request to the Court that certain evidence can be deleted and that certain evidence can be substituted.

THE COURT:  Okay.  And then the Court will have to hear objections to that.

And what remains to be done to get the case set for trial?

MS. ROSS:  Your Honor, I don't believe that Your Honor hears objections to the CIPA Section 4 motion.  I believe you make a decision based off of the representations provided in that.

And then following Your Honor's decision in that CIPA Section 4 motion, the defendants can file a CIPA Section 5 motion.

THE COURT:  Okay.

MS. ROSS:  That's my understanding of how it works.

THE COURT:  Assuming that's all done promptly, because that's within my control, then what remains to be done to get this case to trial?

MS. ROSS:  Your Honor, I think the CIPA is the big hurdle in this case.  Once the CIPA litigation is squared away and all the defendants have their clearance and we are able to sort out the CIPA discovery, the government would be ready to set a motions calendar and go to trial.

THE COURT:  What is the length of trial that you are looking at?

MS. ROSS:  Your Honor, we would anticipate that the government's case-in-chief would take approximately three to four weeks.

THE COURT:  Three to four?

MS. ROSS:  Weeks, Your Honor.

THE COURT:  All right.  I'm concerned about getting a date set, because these lawyers have got other cases, and if we could get a date set too far off now, we're never going to get a date that everybody can live with.  That's why I'm worried today.  It's already a year in March.  So I've got to get a date set, I think.

MS. ROSS:  It is my understanding again that nobody is asking for that at this point.  We understand the Court is very

busy, as are everyone sitting at the tables.  Just given the amount of discovery --

THE COURT:  I'm not going to be too busy for this trial.  This trial is a long-pending case.  My problem is going to be the lawyers are going to be begging for more time at some point.

Let me talk to the lawyers.  Mr. Coburn, you wanted to start?

MS. ROSS:  Thank you, Your Honor.

THE COURT:  I know how this works, as do you, Mr. Coburn.

MR. COBURN:  Well, I think Your Honor's prediction is, unsurprisingly, precisely accurate in terms of how this is going to go.  Unfortunately, I and, I think, all the lawyers in this case and certainly the ones that appear to be heading towards trial are all in agreement that at this moment in time, it's just too early to set, you know, motions dates, trial date, anything like that.

And part of it is CIPA related.  It won't surprise Your Honor to hear that the government and we are very likely to have different perspectives on the classified information in this case.  And certainly, we're completely fine with proceeding in the normal manner, having the government file its Section 4 and then we will file Section 5.  I would anticipate that resolving the CIPA issues in this case is going to be a complicated,

fairly lengthy endeavor.

There's been a little bit of preliminary informal conversation between us and the government.  So I have a sense of what their perspective is going to be.  And I think our perspective is likely to be very different.

In addition, Ms. Ross was just alluding to a production that's coming with respect to devices that were seized.  And in terms of whether or not that's going to be all the relevant devices, we're not sure.  I mean, it's yet to be seen.  But my impression is that there are at least some devices in the case for -- we know this is really kind of overwhelming for the prosecutors as well.  But there are some devices in this case that are going to be just multi-terabyte productions, and getting through all of that is going to be a real endeavor.

So there's that, and also, Ms. Ross was alluding to what she refers to as a "filter team issue."  This has to do with potentially privileged materials.  And again, there's been some informal communication between us and the government about this. I know the government is working hard with respect to that issue, but it's an enormous volume of materials, and sorting out whether or not there's a claim of privilege for Mr. Olson, for other related entities is just going to be a very complicated thing.

And there are a whole series of related cases, civil cases, criminal cases.  That's not really something that is going to

slow the Court down, I don't think, but we're going to have to get on top of all of that before we know what motions are to be filed.

So putting all that together, we're in agreement with the proposition that we're not there yet in terms of setting dates, but certainly, we understand the Court's not at all unexpected and certainly very well-taken concern about scheduling in this case.

THE COURT: All right. So in terms of your client, you don't have an issue with waiving speedy trial until the next status hearing? And I will set the next status as promptly as I can.

MR. COBURN: Most definitely, Your Honor, no issue at all.

And in terms of the next status date, like I said, I mean, certainly, we know the case needs to move along. I just want to be sure that it's -- that -- well, I will put it this way: I would suggest to Your Honor that the Court is going to want to set that date sort of with the notion in mind that substantial progress on all those things I was just referring to can be made between now and then.

THE COURT: So it's after they file their Section 4 notice and maybe after you have filed your Section 5 motion?

MR. COBURN: I agree.

THE COURT: Thank you, Mr. Coburn.

MR. COBURN:  Thank you, Your Honor.

MR. DIAMONDSTEIN:  Your Honor, for the record, Michael Diamondstein.

I would agree in large part with what Mr. Coburn said, and I would agree in substance with what the government suggested, that we're nowhere near setting a motions or even a trial date.

To give the Court a little context at least from our perspective, when we say 16 devices, my understanding of what it is, it's servers from the company from New Mexico and also, I think, one of the defendant's personal documents.

My understanding is there could be a million-plus data points, maybe more, on these documents.  From our perspective, not only are the documents themselves important, but the creation and where these documents were created are important.

So not only must we wait for, I guess, Thea to make a privilege review, potentially Mr. Olson's counsel to make a privilege review, we then have to go through the documents. After we go through the documents, there may be a significant portion of those documents where I have to send those documents to my computer expert, who is going to tell me what the metadata means, who created the document, where the document went.

So I would respectfully suggest that setting a motions date would put a tremendous amount of pressure on the defendants, because we don't have the assets that the government has.  I have a couple lawyers helping me, but to go through a

million-plus more documents is going to take us a tremendous amount of time.

I would also suggest that the CIPA information and motions are going to take a significant amount of time, because my client's relationship with the United States government goes back decades, and I'm in a different position. So I would ask the Court not to set a motions or trial date, because I think all it's going to do is add to the likelihood of me having a stroke. I don't think we're anywhere close to that point.

I would ask the Court to set another status date, because I intend as of today to issue some subpoenas and would like that rule returnable date, if possible.

Thank you, sir.

THE COURT: Okay. Mr. Buscher's attorney?

I don't want to give anyone a stroke.

MR. ELLERMAN: Good morning, Your Honor.

I agree with prior counsel and the government that it's premature at this point to set a trial date -- we are not asking for that -- nor a motions schedule, as long as -- and I have spoken with co-counsel -- that not setting a motions date does not preclude us from filing motions at any time that we choose to do so, whether it's tomorrow or it's six months from now. My experience is that those two are consistent with one another.

I do want to raise sort of a subset of what Mr. Diamondstein and Mr. Coburn and Ms. Ross discussed, about

13

documents that have not been produced, may be produced soon. And it's actually, at least it has been an issue in which the government and the defense are aligned, have been sort of on the same page, which of course is unusual, and that may have changed, but it involves the attorney-client privilege and the claim over documents that have been withheld and is currently being withheld by the filter team.

Just a little history:  The documents, I believe maybe all of them, at least most of the ones being discussed, are documents that were produced to the government in August of 2023, several years ago, by the receiver; the receivership that is recently concluded and the receivership in which the judge, a colleague of yours on the bench, Judge Castel in the Southern District of New York, has been very critical of some of the parties' actions in that receivership, specifically about the conduct of one of the parties who, I believe, is the one claiming the privilege.

So early on, when our clients were first brought before you, arraigned before you, I raised with Mr. Gold my concern that documents were being improperly withheld under the attorney-client privilege.  In other words, there just was not a basis to continue it any longer, given the dynamics and the parties in the case.  He did not disagree with me.  At the time it was unclear to him whether the privilege was being held by Brathay (phonetic) or by the receiver.  Honestly, it is still

unclear to me which party is claiming the privilege, but one of those two parties is claiming the privilege.  I don't think either of them should be claiming the privilege.

In the production from the filter team that Ms. Ross just referred to, we did get a lot of documents.  Something like 40 percent of them, if I have my numbers right, were corrupted, unable to be read.  They were produced to the government by the receiver corrupted, which that sort of circles back to what Mr. Diamondstein said about the servers and why it's important that those are preserved and we get the benefit of those documents, so we can see the originals of the ones that are corrupted.

Some of the documents that were not corrupted that we did get access to were the privilege logs for the documents that are being withheld.  And I will just put it generously.  The assertion of privilege was expansive.  It's a very generous interpretation of the attorney-client privilege, and I think again, based on the -- who is claiming it, there's just no reason to continue it.

I can say, just a quick glance at the privilege log, there are a number of documents that are -- could not be, at least on their face, more relevant as to Mr. Buscher.  For instance, communications between parties in this case, subject line "Buscher," those are obviously documents that could be very probative.  I can't get access to them.

I raised this issue with Mr. Gold several times, and again, he agreed with me that we need to move forward to find a way for Brathay or the receiver to waive the privilege so everybody, including the government -- it's in their interest to get these documents, too; Mr. Gold acknowledged that -- to find a way to move forward to get those documents.

We agreed that we would -- I would wait before filing a motion with the Court.  He was going to work with them to see what we can do, and he even suggested we may end up filing a joint motion.

That was many months ago.  Still, I don't see anything changing.  I very much, and I would think the government would very much, want to see these documents, and it sounds like from what Ms. Ross said we are going to get a production from the filter team.  But unless -- and I would love to be corrected, those documents are not going to include the documents on which assertion has been -- the privilege has been asserted.

So I would like to raise it for the Court as an issue that hopefully we can, with the government together, find a way that relevant facts, highly probative relevant facts can be provided to both parties, both sides.

Thank you, Your Honor.

THE COURT:  Okay.  I encourage you all to see if there's a way you can work together on that.  If not, I can always take that by a separate motion.

Okay.  Mr. Fargnoli's counsel?

MR. LOVETT:  Good morning, Your Honor.  William Lovett on behalf of Mr. Fargnoli.

Our position is we have not had access to the CIPA materials, but we have been cleared.  And I agree with the other defense counsel, that I've looked at some of these potentially privileged documents that were sent over.  I don't see that there's any privilege in any of them.

So I think that -- there's a protocol that was put in place, and we will have to take advantage of that protocol if we want to use any of those documents.  And I, obviously, haven't seen the potentially privileged documents that are a part of the next group of discovery.

THE COURT:  Okay. And counsel for Mr. Swati?

MR. NICHOLAS:  Good morning, Your Honor.

Counsel have done a good job of articulating the issues.  I do not have anything substantive to add, as much as I would like to stand here and talk.

THE COURT:  All right.  Ms. Ross, do you want to give me a suggestion of when we have a further status, then?

MS. ROSS:  Yes, Your Honor.

First, I want to correct the record on one thing.

THE COURT:  Okay.

MS. ROSS:  The filter production that we intend to make consists of images of 16 devices seized from defendant

Olson's house.  They are devices.  Nowhere in this case do we see servers, which I think may even heighten the need to talk to the privilege holder and see what information we can get.

So I think we are in agreement with defense counsel on all of that.  I just wanted to make sure everybody is clear about what was being produced pursuant to the filter protocol.

In terms of the next status date, Your Honor, like I said, we really hope to file our CIPA motion in March.  It's a little bit out of our hands.  If it was just up to us, we would be able to make that representation.  Unfortunately, it's not.  But that is our hope.

And so I think, Your Honor, perhaps at the next status date -- allowing us to file in March, hopefully no later than April, if we can get it done, maybe another status in May would be appropriate.

THE COURT:  For my purposes, I think as far out I can stomach would be March 13, which is a year from the filing.

So how about 11:00 a.m., March 13, and I will see where we are then.

MS. ROSS:  That sounds good, Your Honor.

THE COURT:  Does anybody have a conflict with that date?  Somebody's got a trial that date.

MR. NICHOLAS:  Your Honor, Max Nicholas for Mr. Swati.

I have a trial in the Southern District of New York, a criminal trial, starting March 2nd.  I expect it to be over

by -- I think it should go two to three weeks.  So end of March would be okay with me, but probably not before late March.

THE COURT:  All right.  March 27?

MR. DIAMONDSTEIN:  Your Honor, if the Court pleases, that date does not work for me.

THE COURT:  I couldn't hear you.

MR. DIAMONDSTEIN:  I'm sorry, Your Honor.  That week of March does not work for me, if the Court pleases.

THE COURT:  Is yours likely to be over by the 20th?

MR. NICHOLAS:  It is, Your Honor.

THE COURT:  All right.  How about the 20th?

MR. DIAMONDSTEIN:  I will make the 20th -- if I can just check, please.

I'm sorry, Judge.  My father-in-law passed, and the 20th is -- the Celebration of Life is the 19th in Florida.  So I'm not going to be able to make that work, if the Court pleases.

THE COURT:  A day earlier that week?

Actually, that's Rosh Hashanah anyway or something.  Does the 19th work?

MR. DIAMONDSTEIN:  I'm sorry, Judge.  That's the Celebration of -- my father-in-law is having a Celebration of Life in Wellington, Florida, on the 19th.

THE COURT:  When does it start?

MR. DIAMONDSTEIN:  I imagine we would have to fly out on the 18th from Philadelphia to Wellington, Florida.  We plan

on flying back on the 20th.

THE COURT:  I missed when you were leaving.

MR. DIAMONDSTEIN:  I'm sorry, Your Honor.  The 18th in the afternoon.  If I could appear virtually on the 18th, I could do the morning of the 18th, if the Court would allow me to appear virtually.

THE COURT:  All right.  Anybody have a conflict with the 18th?

MR. COBURN:  No, Your Honor.

MR. ELLERMAN:  No, Your Honor.

MS. ROSS:  No, Your Honor.

MR. DIAMONDSTEIN:  Thank you, sir.

THE COURT:  Let's do the 18th at 11:00 a.m., then.

Do you think that will work or no?

MR. NICHOLAS:  I think, Your Honor, there is probably a 70 percent chance it does.

If it does not, I won't try to hold up the conference.  I will either have someone from my office cover or -- I'll make sure that Mr. Swati is covered appropriately.

THE COURT:  All right.  We will set that as a status, and I hope we will be further along and can do something further that date.

MR. ELLERMAN:  Your Honor, if I may.  I am not going to add any changing of dates on the calendar.

I do want to just raise an issue that was brought up by

what Ms. Ross just said about the servers.  It could be that I have been under a misunderstanding, and maybe we're talking about the same thing, but it sounds like we're not talking about the same thing, and I'm going to tee the issue up for Your Honor because it could end up being a very important issue in this matter and with respect to discovery.

The company, obviously, had servers on which the company documents were kept.  The documents that were produced to the receiver, which are the ones that were then given to the government, were from those servers.  Those servers were delivered to some storage place in Albuquerque.  I know the person -- I've spoken with the person who last saw those servers, and in theory, were preserved.  The documents were sent to the receiver.  They were then produced to the government.

It is from those files that the 40,000 corrupted files appeared.  We don't know yet in this next batch if there will be more corrupted files.  We have raised on -- I have raised personally several times with Mr. Gold the importance of making sure there is access to those servers.  I believe that issue was also raised in the receivership action in the Southern District of New York.

And if I heard Ms. Ross correctly, she is not talking about those servers.  She is talking about something else, something that -- Mr. Olson's devices.

I will speak for Mr. Buscher.  What's on those servers and

that is preserved for evidence that can be used in his defense is critically important. We don't know what documents -- what's important and what's not in the corrupted documents, and there's certainly many documents that we don't know if they were withheld, if they were not produced.

But the whereabouts of those servers, I assumed that they were under the custody and control of the government. If they are not -- or under the receivership -- that really is a very critical issue to be determined.

Thank you.

THE COURT: All right. I think there's no one from the Court Security Office here. Am I correct? So I will alert the Court Security Officer to meet with me to get a status report on the pending security issues and getting those completed and make sure that's done as promptly as I can.

And I will see you all back March 18.

MS. ROSS: Your Honor, I'm sorry. Just for the record, the government would move to exclude time under the Speedy Trial Act.

THE COURT: Yes, I will find the time between now and March 18 be excludible with the consent of the defendants. It's in their interest to get this additional discovery and waive speedy trial until March 18, and any further waivers we will take up March 18 to see if we're still on track.

And I understand it's in the defense's interest to get as

much discovery as they can before trial.  I'm anxious to get this to trial myself.  But I understand that.  I'm not going to roll over the defendants' rights to have discovery before they go to trial.

Anything anybody else wants to say today?

MR. COBURN:  Nothing, Your Honor.

MR. DIAMONDSTEIN:  No, sir.

MR. ELLERMAN:  No, Your Honor.

MR. NICHOLAS:  Thank you, Your Honor.

MS. ROSS:  Thank you, Your Honor.

THE COURT:  Thanks very much, Counsel.

I know it will be an interesting trial.  I hope there are not so many documents that it doesn't put everybody to sleep.  I will look forward to the trial someday.

Have a nice new year, if you can.

(Proceedings adjourned at 11:36 a.m.)